FOUNDATION ON ECONOMIC TRENDS, Jeremy Rifkin, Michael W. Fox, Environmental Action, Inc., Environmental Task Force, David Brower, William Turnage, Plaintiffs,

v.

Margaret M. HECKLER, in her official capacity as Secretary of Health and Human Services, James E. Wyngaarden, in his official capacity as Director of the National Institute of Health, Richard M. Krause, in his official capacity as Director, National Institute of Allergy and Infectious Diseases, National Institute of Health, The Regents of the University of California, a corporation, Defendants.

Civ. A. No. 83-2714.

United States District Court, District of Columbia.

May 16, 1984.

Edward Lee Rogers, Washington, D.C., for plaintiffs.

Judith Bartnoff, Asst. U.S. Atty., William Anderson, II, Bracewell & Patterson, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

SIRICA, District Judge.

This matter is before the Court on plaintiffs' motion for a preliminary injunction and defendants opposition thereto. The plaintiffs have sought injunctive relief on their first and second causes of action which allege violations of the National Environmental Policy Act of 1969, 42 U.S.C. § 4332 (1982) ("NEPA") and the Administrative Procedure Act, 5 U.S.C. § 706 (1982) ("APA"). The plaintiffs ask this Court to enter a preliminary injunction enjoining the defendants from commencing a particular scientific experiment and all similar experimentation until the alleged violations have been corrected. The plaintiffs are three organizations and four individuals who have alleged injury by virtue of the defendants proposed actions. The federal defendants are the three federal officials responsible for the supervision of scientific research conducted at or by the National Institutes of Health (NIH). In addition, the Regents of the University of California have recently been joined as a defendant. All of the parties have submitted lengthy memoranda on the pending motion and,

after hearing oral argument, the Court has decided to grant plaintiffs' motion for the reasons recited in this Memorandum.

Before discussing the reasons for this Court's ruling, a few preliminary comments should be made. First of all, this Court is not, and does not purport to be, competent to address the host of scientific issues associated with the use of the recombinant DNA. *See Diamond v. Chakrabarty*, 447 U.S. 303, 317, 100 S.Ct. 2204, 2212, 65 L.Ed.2d 144 (1980). The Court fully joins the comments made by plaintiffs' counsel at oral argument that none of the parties, least of all this Court, is questioning the wisdom or qualifications of the eminent scientists who have labored to insure that this new technology is used in a responsible manner. The issues that this Court must confront are narrow, legal questions. Accordingly, while speculation on the possible benefits and hazards presented by the emerging technology of genetic engineering may intrigue the parties to this litigation, the Court has no desire, authority, or competence to so speculate. This Court's sole task is to review whether the federal defendants should have issued an environmental impact statement under the circumstances of this case.

## BACKGROUND

A little over a decade ago scientists developed the capability of modifying genetic material in the laboratory. Through a process of splitting and recombining a subcellular unit known as DNA, laboratory scientists could begin to control the natural processes of organism reproduction and growth. The product of this process of altering natural hereditary material is generally known by the name "recombinant DNA." The use of this technique has been limited to small organisms, usually bacteria. More importantly, the production processes wherein these new bacteria are created have been confined, until now, to the laboratory. Stated differently, scientists have not yet deliberately released any of these recombinant DNA organisms into the general environment. In a truly commendable effort, the National Institutes of Health took the initiative during the 1970's to develop responsible limitations on the use and possible misuse of recombinant DNA material. The National Institutes of Health took these early steps largely because its own research, and the research it funded, began to use recombinant DNA with increasing frequency. The Director of NIH assumed responsibility for the supervision of the NIH's efforts to promote recombinant DNA research along uniform standards. To aid the Director and his subordinates in this task an advisory committee was created. This committee, called the Recombinant DNA Advisory Committee (RAC), was, and is, primarily composed of eminent scientists in the field who advise the Director of NIH on numerous questions relating to recombinant DNA research. This lawsuit concerns the decision of the NIH Director, aided by the RAC, to permit the deliberate release of recombinant DNA material into the general environment. The plaintiffs have raised a procedural challenge to the manner in which the federal defendants have authorized deliberate release experimentation to occur. Specifically, the plaintiffs contend that the federal defendants failed to issue appropriate environmental impact statements in conformity with the terms of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332(2)(C), and in accordance with the regulations of the Council on Environmental Quality. 40 C.F.R. § 1500 et seq.

The experiment which prompted the plaintiffs to file their motion is currently scheduled to begin on or about May 25, 1984. Although the plaintiffs seek a preliminary injunction to temporarily halt this individual experiment, they are also seeking a broader injunction to halt all such NIH approved deliberate release experiments. Of the three approved experiments, the most imminent experiment will be conducted by scientists from the University of California at Berkeley later this month. As summarized by the University, the California experiment involves the application of a genetically altered bacteria

onto a row of potatoes in northern California. *See* Opposition of the Regents of the University of California, Appendix. The anticipated effect of the application is to make the plants on which the bacteria is placed more frost tolerant and thereby reduce the risk of frost damage. Having completed their laboratory examination of the bacteria, the University of California scientists have sought and obtained approval from NIH to conduct a field test of this organism in northern California. All of the parties agree that this individual experiment was proposed, considered, and approved without the benefit of an environmental impact statement or assessment document.

The plaintiffs appear before the Court seeking a preliminary injunction against the defendants enjoining not only the first deliberate release experiment, but also all similar experimentation authorized by NIH. The plaintiffs argue that this first experiment should be enjoined until such time as the defendants compile an environmental impact statement. In a more general argument, the plaintiffs assert that when NIH first decided to allow any deliberate release experimentation at all, NIH officials had an obligation to engage in a more comprehensive environmental analysis than that which actually took place. In ruling on the plaintiffs' motion for a preliminary injunction this Court has looked to the four traditional factors which must be present before a court can issue a preliminary injunction. Thus the Court has examined the record to determine whether the plaintiffs have shown: (1) a substantial likelihood that they will succeed on the merits; (2) irreparable injury to plaintiffs' interests if injunctive relief is denied; (3) lack of injury to the defendants if injunctive relief is granted; and, (4) the public interest favors preliminary injunctive relief. *Washington Metropolitan Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 844 (D.C.Cir.1977); *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958).

The National Environment Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321–4347 (1982), was enacted by Congress to insure that the federal government would not undertake major programs or projects without first considering the potential environmental consequences. The Act places an affirmative obligation on the federal government to address potential environmental hazards in a forum open to the public before the government embarks on any particular course of conduct significantly affecting the environment. The Act itself does not dictate any particular accommodation between the frequently conflicting demands of environmental protection and the direction of federal conduct. Instead, NEPA contemplates that responsible federal officials will heed the substantive and procedural requirements set forth in the Act before reaching final decisions about major federal actions. The primary procedural requirement contained in the Act demands that federal decisionmakers compile an Environmental Impact Statement (EIS) prior to final approval of all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

The EIS requirement is the principal mechanism chosen by Congress to implement the environmental policies articulated in NEPA. Although the requirement of formulating an EIS accomplishes NEPA's general goal of forcing federal officials to take account of the environment, environmental impact statements perform other valuable functions in keeping with NEPA's purpose. Initially, the actual drafting of the impact statement requires the identification, adoption, and integration of various factual material which the policymaker considers probative as to the assessment of environmental hazards. Second, the drafting process affords the public an opportunity to observe and understand the reasoning of the federal policymaker. Indeed, this informational function of an EIS is particularly important when the federal decision under consideration is a matter of some public controversy and addresses a subject concurrently under extensive investigation by Congress. Finally, after the process of

drafting the EIS is complete the final document remains as a testament and record of the investigation, deliberation and resolution of the environmental questions posed by proposed federal action. *See generally* McGarity, *The Courts, the Agencies, and NEPA Threshold Issues,* 55 Tex.L.Rev. 801, 805–08 (1977). Of course, Congress did not anticipate nor intend that every federal action should be accompanied by this process. Only "major Federal actions significantly affecting the quality of the human environment" require the compilation of an environmental impact statement. As previously indicated, this litigation centers on whether the challenged federal action falls within this category of federal conduct and, if so, whether the defendants fulfilled their obligation to draft an EIS.

As the Court interprets the plaintiffs' position, the federal defendants allegedly took at least two separate "actions" which should have been preceded by the preparation of an environmental impact statement. At a minimum, plaintiffs urge, these actions should have prompted the federal defendants to prepare an environmental assessment (EA) as to each action with the requisite finding of no significant environmental impact. *See generally* Glitzenstein, *Project Modification: Illegitimate Circumvention of the EIS Requirement or Desirable Means to Reduce Adverse Environmental Impacts?,* 10 Ecology L.Q. 253–54 (1982) (discussing administrative process of EIS formulation). These two separate "actions" are: the issuance of NIH authorization for the University of California deliberate release experiment and the alteration of the NIH Guidelines to allow NIH authorization of deliberate release experiments at all. As to the latter "action" by NIH, the plaintiffs argue that the federal defendants violated 42 U.S.C. § 4332(2)(C), not only by failing to issue an EIS before the actual modification of the NIH Guidelines but also by failing to issue a broad "programmatic" EIS covering NIH's role and responsibility in the entire area of deliberate release experimentation. The Court will consider each of these alleged "major Federal actions" separately.

## I. The Standard of Review

◼ Because the plaintiffs must meet their burden of proving a substantial likelihood of success on the merits, the Court has to compare the plaintiffs' showing in support of their motion with that showing which is required for the plaintiffs to prevail on the merits. The decision on whether or not to initiate the formal process of compiling an EIS is largely left to the discretion of the agency contemplating the action. *Committee For Auto Responsibility v. Solomon,* 603 F.2d 992 (D.C.Cir. 1979). "An initial agency determination on this matter is judicially vulnerable only when the agency has abused its discretion or has acted arbitrarily." *Id.* at 1002. In making its determination, the agency must be guided by what has been termed the "rule of reason." *Id.* at 1003; *North Slope Burrough v. Andrus,* 642 F.2d 589, 600 n. 47 (1980). The "rule of reason" also applies to "[a]gency decisions setting limits to the scope of their environmental review." *National Wildlife Fed. v. Appalachian Reg. Com'n,* 677 F.2d 883, 889 (D.C.Cir. 1981). In reviewing the merits of the agency's decision this Court must inquire:

> (1) whether the agency took a 'hard look' at the problem; (2) whether the agency identified the relevant areas of environmental concern; (3) as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant; and (4) if there was impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced it to a minimum.

*Cabinet Mountains Wilderness v. Peterson,* 685 F.2d 678, 682 (D.C.Cir.1982). It is this "hard look" inquiry that the plaintiffs ask the Court to undertake.

## II. A Brief History of the NIH Guidelines

The NIH Guidelines for Research Involving Recombinant DNA Molecules were issued on July 7, 1976. 41 Fed.Reg. 27,902 (1976). By its own terms, the original

Guidelines governed all research using recombinant DNA, as it defined that term, "conducted at or sponsored by" the National Institutes of Health. The Guidelines set out the standards which research scientists must follow in their handling of recombinant material. Summarized briefly, the Guidelines establish different levels of physical and biological containment procedures to which research scientists must adhere or face termination of NIH funding. *See* 48 Fed.Reg. 24563 (June 1, 1983) (NIH Guidelines § IV–D); McGarity & Bayer, *Federal Regulation of Emerging Genetic Technologies,* 36 Vanderbilt L.Rev. 461, 501–03 (1983). The Guidelines separate all recombinant DNA experiments into four risk categories and identify an escalating level of involvement and review by NIH for each category. When the NIH Guidelines were originally issued in 1976, the deliberate release of recombinant DNA molecules into the environment was expressly prohibited. 41 Fed.Reg. 27,914–15 (July 7, 1976) (NIH Guidelines § III–A–iv). The deliberate release of recombinant DNA into the environment was one of six explicit types of experimentation that the original Guidelines prohibited.

The National Institutes of Health issued a draft EIS in September of 1976, 41 Fed. Reg. 38425 (1976), and adopted a final EIS for the NIH Guidelines in October of 1977. *See* National Institutes of Health, Environmental Impact Statement on NIH Guidelines for Research Involving Recombinant DNA Molecules of June 23, 1976 (two parts) (Oct. 1977) (hereinafter referred to as "NIH Guidelines EIS"). In promulgating the NIH Guidelines EIS, the Director of NIH stated for the record that "[t]he issuance of Guidelines establishing conditions and precautions with respect to recombinant DNA experiments is viewed by NIH as within the category of a Federal action that may significantly affect the quality of the human environment." NIH Guidelines EIS, at 2. There is no dispute in this case over whether the EIS for the original Guidelines satisfied the requirements of NEPA. Instead, the dispute concerns a later modification to the Guidelines

which removed the absolute prohibition on the deliberate release of recombinant DNA into the environment. Because the original NIH Guidelines barred any experimentation involving the deliberate release of this material into the environment, the environmental impact statement on the original Guidelines did not purport to address the hazards posed by such activity. Thus, the most one can say about the original EIS is that it did not consider the environmental impact of deliberate release experimentation at all. A more ominous conclusion one may draw from the silence of the EIS is that, as late as 1977, the deliberate release of recombinant material was so potentially hazardous as to be beyond prudent consideration. *See* 41 Fed.Reg. 27907 (July 7, 1976).

In accordance with NIH's announced intentions, the Guidelines have been the subject of continuous review and reconsideration in light of advances in scientific knowledge. Substantial modification of the NIH Guidelines occurred in 1978, 1982, and 1983. Only one of these three revisions, the 1978 revision, was accompanied by a document purporting to evaluate the environmental consequences of the adopted changes. This document, an EA, 43 Fed. Reg. 60101 (December 22, 1978), concluded that the 1978 revisions to the NIH Guidelines presented no significant impact on the environment. 43 Fed.Reg. 60101. Because the parties have different views on the character of the revisions effected in 1978, 1982 and 1983 as those revisions relate to deliberate release experiments, the Court will briefly describe the revisions in accordance with the plain language of the documents themselves.

The 1978 revisions to the NIH Guidelines represent the first major effort to recast the Guidelines based on new scientific information obtained since the Guidelines were first issued. Some of the more important features of the 1978 revisions include a general relaxation of the Guidelines' stringency; an offer of NIH's assistance to private industry whereby NIH would evaluate private recombinant research for volun-

tary compliance with the Guidelines; the extension of NIH sanctions to not only directly funded research but also to other recombinant research at institutions enjoying any amount of NIH recombinant research funding; and, allowing the Director of NIH to make "exceptions" to the blanket prohibitions present in the original Guidelines. This last revision, granting the Director of NIH the authority to grant exceptions to the six absolute prohibitions contained in the Guidelines is the subject of this litigation.

As previously mentioned, the 1978 revisions to the Guidelines were accompanied by an environmental assessment. In fact, there were two documents described as environmental assessments issued by the NIH Director: one for the revisions as proposed, 43 Fed.Reg. 33096 (July 28, 1978), and one for the revisions as adopted. 43 Fed.Reg. 60101 (December 22, 1978). As the NIH Director remarked in his environmental assessment on the proposed 1978 revisions: "A *major* proposed revision would give the Director, NIH, authority to grant exceptions to any of the six prohibitions." 43 Fed.Reg. 33107 (July 28, 1978) (emphasis added). Under the proposed changes and in the resulting revision, the Director of NIH could not grant an "exception" unless he had the prior advice of the NIH Recombinant Advisory Committee (RAC). This grant of authority to the NIH Director to waive compliance with the Guideline prohibitions was recommended by the RAC, 43 Fed.Reg. 33051, and supported by commentators, 43 Fed. Reg. 33109. The sole "rationale" given by both the RAC and public commentators for bestowing this authority on the Director was to grant the Director the discretion to authorize otherwise prohibited experiments which were "desirable for some compelling social or scientific reasons—for example, risk assessment." 43 Fed.Reg. 33107. *Accord,* 43 Fed.Reg. 33109, 33111. In other words, the only articulated reason given for permitting the Director to waive the Guideline prohibitions was to allow experimentation on assessing the risks of recombinant research.

When the NIH Director's initial comments on the proposed 1978 revisions, found in his proposal summary, his proposed recommendations, and his environmental assessment of the proposed revisions, are compared with his Final Decision adopting the revisions, it is apparent that some public commentators were very concerned with this change in the prohibitions section of the NIH Guidelines. In particular, the waiver of the Guidelines' ban on experiments involving the deliberate release of recombinant DNA into the environment provoked commentary. 43 Fed.Reg. 60083 (December 22, 1978). When proposing the revisions the NIH Director stated that in the revised Guidelines "the prohibition of deliberate release into the environment of recombinant-DNA-containing organisms can be waived if all the requirements for a waiver *(and those of the National Environmental Policy Act)* are met." 43 Fed.Reg. 33110 (July 28, 1978) (emphasis added). In his final decision adopting the 1978 revisions, the NIH Director actually acknowledged the lack of "definitive standards" under the revised Guidelines for authorizing deliberate release experiments and referred the question of standards to the RAC "for its consideration." 43 Fed.Reg. 60083 (December 22, 1978). Nevertheless, the Director stated that although "all waiver decisions will include a careful consideration of the potential environmental impact," *id.,* he would determine the necessity of an environmental assessment or full impact statement "on a case-by-case basis." *Id.* Finally, the Director rejected the suggestions of public commentators that the standard for a waiver decision be "no significant risk and a clear social benefit to be realized," *id.,* and further refused to limit waivers only to risk-assessment experiments. *Id.* Neither of these decisions were elaborated on in the Directors' short environmental impact assessment on the final version of the 1978 revisions. *See* 43 Fed.Reg. 60101 (December 22, 1978).

On the record before the public, by the end of 1978 the Guidelines allowed the NIH

Director to grant exceptions to NIH-funded institutions in order to allow the deliberate release of recombinant DNA into the environment. The only previously articulated justification for such experiments was to further research into the risks posed by deliberate release. As interpreted by the Director, however, his authority was not restricted to allowing only risk assessment experiments. Instead, the Director could permit deliberate release experiments, based on standards that the RAC would have to formulate, on a case-by-case determination. In a similar fashion, the Director would determine the need for an environmental impact assessment or statement on a case-by-case basis. In justifying the first conclusion, that he could grant exceptions for as yet unarticulated reasons, the Director stated that the procedural safeguards of RAC review and public participation constituted an adequate "standard" for authorizing deliberate release experimentation. 43 Fed.Reg. 60083 (December 22, 1978). As for the Director's second conclusion, however, the Director did not delegate responsibility for deciding whether to compile an EIS or EA to the RAC for their consideration. Any doubts on the Director's view of the role of the RAC in addressing NEPA have subsequently been answered by the Director's own published remarks: "It is not the function of the RAC to determine what NEPA and the CEQ regulations require. The RAC is not constituted to interpret points of law and the requirements of NEPA. Specifically, it is not a function of RAC to determine when an environmental impact statement or an environmental assessment is required by NEPA." 49 Fed.Reg. 697 (January 5, 1984). Consequently, as of December 1978 any articulation of a standard for when a waiver decision required an EIS or EA was left to the "consideration" of the Director of NIH. See also 43 Fed.Reg. 60126 (December 22, 1978) (§ IV–E–1–B). Accordingly, the Court will look to the Director's actions to assess whether NEPA has been satisfied.

The only indication in the Guidelines that appears probative on the Director's "case-by-case" decision under NEPA is found in Section IV–E–1–b–(1), where it lists permitting deliberate release waivers as a "major" action of the Director. 43 Fed.Reg. 60126 (December 22, 1978). This characterization of the Director's decision to grant an individual waiver for deliberate release experiments as "major" by the Guidelines is consistent with the initial EA wherein the Director acknowledges that vesting authority to grant any type of waiver in the Director is a "major" revision of the Guidelines. 43 Fed.Reg. 33107 (July 22, 1978). Both of these "major" actions are the subject of plaintiffs' challenge in this litigation.

After the revisions in 1978 the defendants did not compile any additional environmental documents about deliberate release experimentation except for three published notices that the Director had approved three deliberate release experiments. From the record presented by the defendants the Court also cannot find any further elaboration on the appropriate "standards" for permitting such experiments. On the basis of the Director's 1978 comments, therefore, the Court must conclude that the "standard" for granting a waiver can only be described as whatever it takes to win the confidence of, hopefully, at least a majority of the RAC and the subsequent approval of the Director of NIH.

When NIH further revised the Guidelines in 1982 and 1983, the Director's authority to grant a waiver for deliberate release experiments was retained although the terminology was altered slightly. Instead of granting "exceptions" to the Guideline's prohibitions, the Director was allowed to grant "permission" to NIH grantees for otherwise prohibited experimentation. 47 Fed.Reg. 17186–87 (April 21, 1982) (§ III–A–2); 47 Fed.Reg. 17191 (April 21, 1982) (§ IV–E–b–(1)–(e)). Finally, in 1983, the Director of NIH further amended the Guidelines' deliberate release provision, § III–A–2, to allow NIH to make categorical exceptions to the ban on deliberate release for certain plants. None of these post-1978 changes have any bearing

on this litigation and the plaintiffs' claim that the Director of NIH first obtained authority to permit deliberate release experiments by virtue of the 1982 amendments is without merit. Nonetheless, the issues presented by deliberate release experimentation were the subject of continued concern, if not action, by members of the RAC. *See* 47 Fed.Reg. 17167, 17168 (April 21, 1982).

### III. NEPA and the NIH Guidelines

The plaintiffs most far reaching challenge in this litigation is aimed at the substantive modification in 1978 of the NIH Guidelines from an outright prohibition on deliberate release experimentation by NIH affiliated researchers to the authorization of such experiments after clearance by the NIH Director. This change in the NIH Guidelines, from a total ban to qualified permission, was accompanied by an environmental impact assessment that found no significant effect on the human environment. Plaintiffs question the federal defendants' substantive conclusion as to the impact of this change and contend that a full EIS should have been compiled. Plaintiffs further argue that the defendants, at least as of 1982, should have issued a programmatic EIS addressing environmental issues common to all NIH-funded deliberate release experiments. The Court's inquiry into these two different assertions will, of necessity, begin with the actions taken by the defendants and their evaluation of NEPA's commands.

### A. The EA for the 1978 Change.

The National Environmental Policy Act of 1969 requires the timely preparation of a full environmental impact statement for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). As previously mentioned, the two EAs on the proposed and final 1978 Guideline revisions are the sum total of the federal defendants environmental record on the impact of deliberate release experiments [1]. Unlike judicial review over some other types of administrative action, NEPA anticipates and demands that the discussion of environmental values be centrally located in one environmental document. *Friends of the River v. FERC*, 720 F.2d 93, 105–06 (D.C.Cir.1983). Accordingly, this Court should limit its review to the two EAs to ascertain whether the federal defendants' conclusion as to lack of any need for a complete environmental impact statement can be sustained.

The Court has no difficulty in finding that the 1978 Guideline change was a "major Federal action." Indeed the federal defendants have not disputed this point, perhaps because of the contemporaneous declaration of the NIH Director that the change was "major." 43 Fed.Reg. 33107 (July 22, 1978). Rather, the dispute will revolve around the Director's conclusion that the change had no significant impact on the environment. Therein lies the Court's problem. Attention to the two separate EAs reveals that the second EA is little more than a summary of the first EA on the proposed revisions to the Guidelines. *See* 43 Fed.Reg. 60101 (December 22, 1978) (Appendix I). In particular, the second EA did not specifically address the revisions involving deliberate release experimentation or any other expressly prohibited research. Although the first EA had briefly discussed the new possibility of NIH approval for deliberate release experiments, the EA stated that any such approval must meet the requirements of NEPA in addition to the procedural mechanisms established by NIH for making waiver decisions. More importantly, although the final EA was silent on the impact of this change, the

---

1. The original Guidelines did not permit deliberate release experimentation. The original Guidelines focused exclusively on research confined to the laboratory. In *Mack v. Califano*, 447 F.Supp. 668 (D.D.C.1978) (Smith, J.), the Court found the original Guidelines and the subsequent EIS sufficient under NEPA. In so doing, however, the Court found the Guideline prohibitions "significant[ ]", *id.* at 669, and considered the Guidelines adequate to "insure that no recombinant DNA molecules will escape from the carefully controlled laboratory to the environment." *Id.* at 670. Obviously, these premises are not applicable to this litigation.

Director did discuss several comments he had received on this subject in his published Decision to issue the final revised Guidelines. 43 Fed.Reg. 60082 (December 22, 1978). Although these comments are not found within the four corners of the defendants' final EA, the Court will nonetheless consider the comments because they offer the only glimpse into the contemporaneous views of the Director.

In the Director's general comments on the changes in the prohibitions section of the NIH Guidelines, the Director refused to articulate any standards, requirements, or values which would guide the future exercise of his discretion to permit deliberate release experiments. 43 Fed.Reg. 60083. Instead, the Director deferred the elaboration of any "definitive standards for allowing exceptions" until later and left the matter for further consideration by the RAC. *Id.* The Director's actual decision on the standards for deliberate release approval was thus to make no decision at that time. The record is unclear on whether the Director's refusal to address environmental concerns at that time was based on the remote likelihood of such experiments occurring in the near future or on the expectation of a future study on appropriate criteria. It is now abundantly clear that the technology is available while written criteria are not.

The National Environmental Policy Act envisions that environmental concerns will be addressed *before* not *after* major Federal action is begun. *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1500.1(b) (1983). The Director of NIH apparently decided to withhold his decision on the need for an EIS until he was faced with an individual waiver application. Accordingly, the Director did not evaluate, on the record, any particular deliberate release experiment nor did he address generic environmental issues which may be common to all such experiments. *Cf.* 40 C.F.R. § 1502.4(b)(3) (1983). Obviously, on this sparse administrative record, the Court would have a difficult time locating the required "hard look" inquiry which NEPA demands. Accordingly, unless the Court were to assume that all

such experimentation would have no significant environmental impact, the administrative record strongly indicates that plaintiffs will succeed in demonstrating the absence of a "hard look" at this admittedly major policy change.

The Director thus approved major Federal action without benefit of a specific or general investigation into the environmental hazards of deliberate release experimentation. Based on this record, the Court must evaluate whether the Director's decision to forego preparation of an EIS meets the four criteria initially set forth by Judge Leventhal in *Maryland-National Capital Park and Planning Comm'n v. United States Postal Service*, 487 F.2d 1029, 1040 (D.C.Cir.1973). *See also Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 682 (D.C.Cir.1982). As the criteria have been recently summarized, this Court must inquire:

> (1) whether the [NIH] took a 'hard look' at the problem; (2) whether the [NIH] identified the relevant areas of environmental concern; (3) as to the problems studied and identified, whether the [NIH] made a convincing case that the impact was significant; and (4) if there was impact of true significance, whether the [NIH] convincingly established that changes in the project sufficiently reduced it to a minimum.

*Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 682 (D.C.Cir.1982). In this Court's view, NIH plainly has not met the first three criteria. On the fourth criterion, the only mitigation effort the record reveals—future study of definitive standards by the RAC—has not materialized. Again, this record suggests that plaintiffs will prevail on their claims of a violation of either NEPA, 42 U.S.C. § 4332(2)(C), or the Administrative Procedures Act, 5 U.S.C. § 706(2)(D).

Before the Court addresses the plaintiffs' further argument that the defendants should have drafted a programmatic EIS, the Court would like to reemphasize a point about the actions of the federal defendants.

The Court does not wish to second-guess the substantive scientific judgments of the eminent scientists who supervise this research for NIH. In 1978, however, the record fails to reveal the Director of NIH seeking, compiling, or addressing any specific or general data about the environmental hazards associated with the same type of experiments the Director had absolutely prohibited only two years before on the grounds of environmental risk. If the state of scientific knowledge had advanced sufficiently in the interim to refute any probability of risk, then the Director's decision may, if placed in an EA, have supported a finding of no significant impact. Instead, the Director adopted a wait-and-see approach, deferring consideration of the environmental consequences until later.

**B. The Need for a Programmatic EIS for All Deliberate Release Experiments.**

There are two types of environmental impact statements that any agency may issue under NEPA. These two different types of EIS, sometimes referred to as first and second tier statements, view environmental consequences from either a broad (programmatic) or a narrow (site-specific) perspective. *See National Wildlife Fed. v. Appalachian Reg. Comm'n,* 677 F.2d 883, 887–88 (D.C.Cir.1981); 40 C.F.R. § 1502.-4(b) (1983). Plaintiffs argue that NEPA requires that the federal defendants compile a programmatic EIS addressing the broad environmental concerns involved in authorizing deliberate release experiments. The defendants have countered by denying that any "program" of authorizing deliberate release experiments exists.

Once again, "[t]he proper scope of an EIS and the corollary decision whether to prepare a programmatic EIS at all are matters initially committed to agency discretion." *National Wildlife Fed. v. Appalachian Reg. Comm'n,* 677 F.2d 883, 889 (D.C.Cir.1981). As the Supreme Court has held in *Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), a federal agency need not prepare a pro-

grammatic EIS until possible agency action has ripened to the stage where the agency is confronted with a concrete proposal.

At oral argument, plaintiffs' counsel conceded that a programmatic statement was not required until 1982 when the defendants first began to review and approve individual deliberate release experiments. In this sense, the plaintiffs agree that NIH's role with respect to deliberate release experimentation had not been sufficiently defined until 1982 to warrant the drafting of a programmatic environmental impact statement. In large part, then, the plaintiffs' position on the timing of a programmatic EIS echoes the 1978 statements of the NIH Director whereby the Director reserved any decision on the drafting of an environmental impact statement until individual cases provided a firmer basis for environmental evaluation.

Subsequent to the 1978 revisions to the NIH Guidelines, the Director of NIH has reiterated his position that NEPA does not require a programmatic EIS addressing generic concerns associated with deliberate release experimentation. 49 Fed.Reg. 697 (January 5, 1984). The Director has reaffirmed his prior decision despite the intervening review and approval of three deliberate release experiments. The Director's answer is thus the same whether faced with the issue in the abstract, as in 1978, or after he granted approval to three such experiments. While the Court has no difficulty upholding the Director's decision in 1978 that NIH's commitment of resources at that time to deliberate release experimentation did not justify a broad EIS, the "rule of reason" does not similarly support the Director's continuing adherence to that view. The failure of the Director to identify any criteria or standards to guide his decisions to allow individual experimentation does not relieve the Director from his obligation to explain the general environmental concerns he considers relevant. Instead, the Director has authorized three experiments, presumably on the basis of as yet unarticulated standards, without the benefit of any environmental document dis-

cussing potential environmental hazards. It is undoubtedly true that NIH will receive further requests for approval of deliberate release experimentation. "NEPA requires an agency to evaluate the environmental effects of its action at the point of commitment." *Sierra Club v. Peterson*, 717 F.2d 1409, 1414 (D.C.Cir.1983).

If the three deliberate release experiments approved to date have met some threshold standard of environmental safety, a programmatic environmental impact statement could clarify that uniform standard. Most importantly, the compilation of a programmatic EIS at this point in the development of NIH's role in deliberate release research would have great relevance to NIH's future conduct. *National Wildlife Fed. v. Appalachian Reg. Comm'n*, 677 F.2d 883, 889 (D.C.Cir.1981). Such a document would be both "forward looking" and sufficiently broad to avoid "unreasonably constricting the scope of primordial environmental evaluation." *Id.* Hence, the plaintiffs are likely to succeed on their claim that the NIH's commitment to deliberate release experimentation is sufficiently ripe to warrant a programmatic EIS.

This Court's preliminary conclusion that the defendants probably have passed the stage at which a programmatic EIS is necessary finds reinforcement in relevant precedent of this jurisdiction. In *Scientists' Institute for Pub. Info., Inc. v. Atomic Energy Commission*, 481 F.2d 1079, 1089 (D.C.Cir.1973), the D.C. Circuit stated:

> NEPA's objective of controlling the impact of technology cannot be served by all practible means, unless the statute's action forcing impact statement process is applied to ongoing federal agency programs aimed at developing new technologies which, when applied, will affect the environment. To wait until a technology attains the stage of complete commercial feasibility before considering the possible adverse environmental effects attendant upon ultimate application of the technology will undoubtedly frustrate meaningful consideration and balancing of environmental costs against economic and other benefits.

*Id.* at 1089. Although the Supreme Court has cautioned against applying rigid tests for when a programmatic EIS is required, *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), the Court is confident that the federal defendants have passed the point at which a programmatic EIS is required by NEPA and the Council on Environmental Quality's regulations. *See* 40 C.F.R. § 1502.4(c)(3) (1983).[2] The Court finds that the NIH Guidelines could be viewed as a comprehensive federal program which purports to directly govern all NIH-related research involving the deliberate release of recombinant material into the environment. The Court's preliminary conclusion is supported by, but not dependent on, the fact that most other federal agencies have followed the lead of NIH in requiring compliance with the NIH Guidelines. *See* 48 Fed.Reg. 24577 (1983) (Guidelines, app. J); McGarity & Bayer, *Federal Regulation of Emerging Genetic Technologies*, 36 Vanderbilt L.Rev. 461, 501 n. 137 (1983). In addition, the Court finds that there is a substantial likelihood that the defendants' authorization of separate experiments using the same novel technology are "connected," 40 C.F.R. § 1508.25(a)(1), potentially "cumulative," 40 C.F.R. § 1508.25(a)(2), and sufficiently "similar," 40 C.F.R. § 1508.25(a)(3) to justify an EIS of commensurate scope.

## IV. The Defenses of the Federal Defendants.

Even assuming that the actions of the federal defendants violated the terms of NEPA, government defense counsel has urged this Court to deny relief. Briefly stated, the government argues that the

---

**2.** Of course, the CEQ regulations are binding on NIH, *see Andrus v. Sierra Club*, 442 U.S. 347, 357, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979), and the Court must accord substantial deference to the CEQ's interpretation of NEPA as expressed in the regulations. *Id.* Plaintiffs have brought suit under the APA to enforce the CEQ regulations.

plaintiffs should be barred from seeking relief on grounds of laches; furthermore, counsel argues that actions of the federal defendants represent the "functional equivalent" of compliance with NEPA.

## A. Laches

 Laches, which is a legal term for prejudicial, unreasonable delay in asserting one's rights, is a proper defense to a suit brought under NEPA. *Peshlakai v. Duncan*, 476 F.Supp. 1247, 1256 (D.D.C.1979) (citing relevant cases). To make out a proper defense of laches a defendant must show unreasonable delay by the plaintiff and resulting prejudice to the defendant. As to the federal defendants in the case the Court can find neither.

 Delay, of course, is measured by the length of time the plaintiffs allegedly sat on their rights. Defendants complain that the plaintiffs waited five years, from 1978 until 1983, to initiate litigation over the compliance of the 1978 Guidelines revision with NEPA. Additionally, the defendants accurately note that the plaintiffs currently appearing before this Court did not avail themselves of the right to comment on the 1978 revisions afforded the general public. Although the five year delay appears significant on the surface, the Court does not find it unreasonable in light of the NIH Director's statement that further inquiry into the standards for waiving the deliberate release prohibition would be undertaken. In fact, the plaintiffs appear before this Court under the mistaken impression that deliberate release experimentation was first authorized by the 1982 revisions to the Guidelines.

The second element of the laches defense, prejudice to the interests of the defendants, is probably not met on this record. One of the underlying, if not fully elaborated, justifications for the 1978 revision was the developing state of the technology. The asserted reason for the outright prohibition on deliberate release experimentation in 1976 was not merely the lack of safety standards but also the remote probability that deliberate release experiments were feasible at that time. As a result, the potential environmental considerations confronting the Director in 1978 as to deliberate release experiments were discounted because of their remote chance of occurrence. In light of the public comments submitted in 1978, the federal defendants cannot now argue that they are surprised that someone would object to their failure to file an EIS on deliberate release experimentation. In conclusion, the Court finds that the federal defendants have not made out a laches defense in this case.

## B. Functional Equivalence Defense.

Alternatively, the federal defendants contend that strict compliance with NEPA's requirements was unnecessary because their actions constituted the functional equivalent of a traditional NEPA inquiry. The "functional equivalent" doctrine renders the commands of NEPA inapplicable "where an agency is engaged primarily in an examination of environmental questions, [and] where substantive and procedural standards ensure full and adequate consideration of environmental issues." *Environmental Defense Fund, Inc. v. EPA*, 489 F.2d 1247, 1257 (D.C.Cir.1973). The doctrine reflects the judicial awareness that in situations where Congress has commissioned an agency with an environmental mission and the agency conducts major federal activity to enforce its defined responsibilities, not only is there no need for rigid enforcement of NEPA, strict adherence to NEPA may actually interfere with other, more explicit, statutory mechanisms for addressing environmental concerns.

As to the first question, whether NIH, as an agency, is "engaged primarily in an examination of environmental questions," the Court has some doubts. The original Guidelines were issued under the authority of 42 U.S.C. §§ 241 and 242(*l*). *See* National Institutes of Health Environmental Impact Statement on NIH Guidelines for Research Involving Recombinant DNA Molecules 7 (October 1977). The National Institutes of Health is authorized to con-

duct, promote, and fund research "relating to the causes, diagnosis, treatment, control, and prevention of physical and mental diseases and impairments of man." 42 U.S.C. § 241(a). The Court is not certain whether NIH's described responsibilities can be fairly characterized as "primarily" the examination of environmental questions. Even assuming that NIH's mission can be so described, the Court does not find that the current "substantive and procedural standards ensure full and adequate consideration of environmental issues." *Environmental Defense Fund, Inc. v. EPA,* 489 F.2d 1247, 1257 (D.C.Cir.1973).

To begin with, the Court observes that the defendant NIH has no relevant statutory standards to enforce. Unlike § 111 of the Clean Air Act in *Portland Cement Ass'n v. Ruckelshaus,* 486 F.2d 375 (D.C. Cir.1973), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974), or even the Section 18 exemption to the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) in *Environmental Defense Fund, Inc. v. Blum,* 458 F.Supp. 650 (D.D.C.1978), NIH is not operating under any set of statutory or regulatory standards with respect to permitting deliberate release experiments. Moreover, this absence of standards, as previously explained, has not been clarified by any formal or informal action of NIH other than by inference from the unstated standards that apparently were met at the time NIH approved three individual experiments. Accordingly, the only "substantive" standard which allegedly displaces the need for NEPA compliance is that used in the review of individual proposals by the RAC and the Director of NIH. Procedurally, the NIH Guidelines do not require RAC approval but merely demand that the RAC review proposals for permission to engage in otherwise prohibited activity. This non-binding RAC review does perform a valuable service in that it adds the perspectives of a diverse group of knowledgeable scientists on the merits of any individual experiment. Nonetheless this perspective is not focused or recorded by any environmental document. Moreover, the membership of the RAC has been challenged by the plaintiffs as not reflecting the "interdisciplinary" inquiry demanded by NEPA. *See* 42 U.S.C. § 4322(2)(A); 40 C.F.R. § 1502.6 (1983). The plaintiffs have been joined in their complaint as to the adequacy of the current representation on the RAC by a Congressional Staff Report. *See* Staff of House Subcommittee on Investigations and Oversight, 98th Cong., 2d Sess., Report on the Environmental Implications of Genetic Engineering 10, 12, 28–29 (Comm.Print 1984). While the Court is reluctant to rule as a matter of law that the current membership of the RAC is inadequate, especially in light of recent movements by NIH to broaden representation on the RAC, the Court has considered the plaintiffs' allegations in evaluating whether the current procedures are the "functional equivalent" of NEPA compliance.

■■■■ As the Circuit Court of Appeals has previously held, the courts of this jurisdiction will look to the substantive standards and procedures used by the environmental agency and inquire whether they satisfactorily address the "five core NEPA issues." *Environmental Defense Fund, Inc. v. EPA,* 489 F.2d 1247, 1256 (D.C.Cir. 1973). The Court has looked to NEPA's primary aims and has found that the current standards, to the extent they are evident on record before the Court, are plainly not the "functional equivalent" of NEPA.

**C. The Jurisdictional Defense Applicable to Private Experiments.**

■ The federal defendants have raised a third defense directed solely at the process, begun in 1978, whereby NIH permits private corporations to submit their recombinant experiments for non-binding review by NIH. This submission process is completely voluntary and the NIH does not purport to exercise any authority or control over the conduct of the research. *See* 48 Fed.Reg. 24563 (1983) (NIH Guidelines § VI). These private experiments are not governed by the NIH Guidelines because they do not involve any NIH or NIH-affiliated funding. Defendants urge that be-

cause of NIH's lack of jurisdiction over these experiments, *cf.* 40 C.F.R. § 1508.15 (1983), the requirements of NEPA are inapplicable to NIH's voluntary review of private deliberate release experiments. The Court agrees. The absence of federal funding, the lack of NIH regulatory authority, and the voluntary nature of the submission process strongly indicate that the plaintiffs will not prevail on a claim under NEPA as to these experiments.

### THE UNIVERSITY OF CALIFORNIA EXPERIMENT

The Regents of the University of California have raised many of the same arguments offered by the federal defendants in support of their experiment. Nonetheless, the University has attempted to distance itself from the issue of the federal defendants' compliance with NEPA when changing the NIH Guidelines to allow any deliberate release experimentation. Rather, the University demands that the approval of the northern California experiment be judged on its own merits. Indeed, in light of this Court's opinion that the plaintiffs have a substantial likelihood of success on their claim that the federal defendants did not comply with NEPA in changing NIH Guidelines, the University's only hope must lie in the independent adequacy of NIH's review of the California experiment. Unlike the 1978 revision to the NIH Guidelines, however, the approval of the University experiment was not accompanied by *any* environmental document.

At oral argument, counsel for the federal defendants conceded, as she should have, that the granting of NIH approval to conduct the University deliberate release experiment constituted major federal action. Thus, the only question left for NEPA review is whether the experiment will "significantly affect the quality of the human environment." The University argues that the NIH Director's finding of no significant impact is adequately supported by a review of the University's proposal and the minutes of the RAC meeting at which the proposal was considered. Moreover, the University points out that the experiment had to be modified and resubmitted for RAC review because of environmental problems identified by the RAC in a previous University proposal. The plaintiffs' insistence that the decision of NIH, made solely by the Director, be accompanied by an environmental document has been labeled a "fit of formalism" by the University. In the University's view, the informal process of RAC review and Director approval which resulted in a published finding of no significant impact, 48 Fed.Reg. 24548 (1983), fulfilled the requirements of NEPA.

In response, plaintiffs' counsel has countered that the informal, ad hoc nature of the RAC review process cannot be a substitute for a careful, written environmental document identifying important issues for NIH consideration. At oral argument, plaintiffs' counsel offered several examples of questions which could have been raised but apparently were not. For example, the prudence of using potatoes as an experimental crop in an area having potatoes as an agricultural crop should have been raised.

Other possible effects include a potential hazard to adjoining plant and insect populations. Although the hazards may be categorized as a "low probability, high consequence" risk, the defendants have not even begun to describe this risk. Obviously, whatever merit there is in reviewing a proposed experiment in an informal manner is significantly diminished by the lack of any written criteria to guide the NIH Director's ultimate decision.

Placed against these informal approval procedures, the University asks the Court to trace the available evidence of the RAC's deliberations and uphold the Director's final substantive decision. Even assuming that this Court could adequately evaluate the scientific justifications for the Director's decision, NEPA does not require this Court to reconstruct the environmental deliberations of an agency for their adequacy when the agency chooses not to follow the steps outlined in NEPA. The Court is confident that the plaintiffs have identified several areas of plausible environmental concern which are not rebutted on the for-

mal, or informal, record before this Court. Consequently, as to the University of California experiment, the Court finds that the plaintiff has also demonstrated a sufficient showing of probable success to support a preliminary injunction.

The Court has taken account of the various defenses offered by the University. The University's laches defense will probably not impede the plaintiffs' likely success because, as University counsel admitted at oral argument, the experiment could not have been performed this winter due to climactic conditions. Moreover, because of Congress's avowed environmental goals in enacting NEPA, courts in general have not looked with favor on the laches defense in environmental cases. *Coalition for Canyon Preservation v. Bowers*, 632 F.2d 774, 779 (9th Cir.1980). In short, the Court does not consider the plaintiffs' delay in bringing suit unreasonable nor can the Court find any prejudice to the defendants sufficient to invoke the laches defense.

The Court is also unpersuaded of the materiality to this case of EPA's potential jurisdiction under FIFRA over the University's experiment. Moreover, EPA's registration process under FIFRA is not the functional equivalent of NEPA compliance. *Save our Ecosystems v. Clark*, No. 83–3908, (9th Cir. Jan. 27, 1984).

In a similar fashion, the Court cannot conclude that the plaintiffs' failure to seek relief from NIH prior to NIH approval of the University experiment will bar plaintiffs' claims under NEPA. After all, this experiment is the first deliberate release experiment to be approved. Previous public commentators had filed comments indicating that NEPA required an environmental document for any deliberate release experiment. Thus, NIH and the University can hardly claim surprise when the plaintiffs revived this claim in the form of a lawsuit after NIH had rejected the original demand from other public commentators.

## CONCLUSION

In this Court's view, the plaintiffs have made a satisfactory showing that they are likely to succeed on the merits of their NEPA and APA claims. The Court has also evaluated the possible injury that issuance of a preliminary injunction may cause both the federal defendants and the University of California. The Court would like to state for the record that the University's decision, in not going forward with the first approved experiment until the doubts about its legality are answered, is an act to be admired by the academic community. Rather than diminishing its ability to recruit qualified scientists, the University's conduct can only enhance its position as a leading, responsible center for scientific research. The federal defendants, also, will not suffer any significant injury in delaying approval of deliberate release experimentation until the merits of this litigation can be resolved. The public interest clearly favors the maintenance of the status quo until the merits of this litigation are reached.

If the first deliberate release experiment were to go forward at this time the plaintiffs would suffer irreparable injury. In arriving at this conclusion the Court has carefully evaluated the nature of the NEPA violations which the plaintiffs have alleged. The NEPA violations, if proven, are not merely "technical" violations which the Court would be justified in ignoring. *Cf. State of Alaska v. Andrus*, 580 F.2d 465, 485 (D.C.Cir.1978). *See also Friends of River v. FERC*, 720 F.2d 93, 106–07 (D.C.Cir.1983) (substantial compliance with NEPA in combination with futility of remand justifies approval of otherwise inadequate agency EIS). To the contrary, the substantial NEPA violations which the plaintiffs have alleged would probably justify equitable relief on their own regardless of the often stated "presumption" in favor of strict enforcement of NEPA. *See State of Alaska v. Andrus*, 590 F.2d 465 (D.C. Cir.1978); *State of Cal. v. Bergland*, 483 F.Supp. 465, 498 (E.D.Cal.1980).

In summary, the Court has reviewed the decision of the NIH Director: (1) not to issue an environmental impact statement for the 1978 revision to the NIH Guidelines

which provided authority to permit deliberate release experimentation by NIH grantees; (2) not to issue any broad, programmatic environmental impact statement addressing the general environmental issues presented in NIH approval of deliberate release experiments; and (3) not to issue an environmental assessment or an environmental impact statement addressing the specific environmental issues associated with the first deliberate release experiment to be conducted under the revised NIH Guidelines. Although the first decision may more appropriately be classified as a decision deferred than a policy choice, the second decision clarifies any ambiguity as to the Director's intent with respect to addressing the general environmental consequences of deliberate release experimentation. The final decision not to support the very first deliberate release experiment with even an environmental assessment, especially when taken together with the Director's previous actions, strongly suggests the absence of a hard look inquiry. Having so concluded, the Court finds it unnecessary to discuss the other contentions advanced by the plaintiffs.

For the foregoing reasons, the Court will grant the plaintiffs' motion for a preliminary injunction. This Memorandum and Order will constitute the Court's findings of fact and conclusions of law. The Court recognizes the wisdom behind the comments of University counsel that the present system for approving deliberate release experiments, although flawed, is the only one available. Nonetheless, NEPA envisions that there will be a record of the environmental debate, not merely the conclusions, regarding major federal action significantly affecting the environment. Because of the limited record left for this Court's review, a preliminary injunction is justified at this time.

Wherefore, it is this 16th day of May, 1984

ORDERED that the plaintiffs' motion for a preliminary injunction be and hereby is granted, and it is

FURTHER ORDERED, that the defendants Margaret M. Heckler, Secretary of the Department of Health and Human Services, James E. Wyngaarden, Director of the National Institutes of Health, and Richard M. Krause, Director of the National Institute of Allergy and Infectious Diseases, National Institutes of Health, be and hereby are enjoined from:

Approving or continuing to approve experimentation involving the deliberate release of recombinant DNA under § III–A–2 of the 1983 revised NIH Guidelines, or its predecessor sections such as § III–A–2 of the 1982 revised NIH Guidelines or § I–D–4 of the 1978 revised NIH Guidelines until such time as the Court enters final judgment on the merits of counts one and two of plaintiffs' second amended complaint for all applications which have been made or will be made other than those submitted pursuant to § VI of the 1983 Guidelines or its predecessor sections, and it is

FURTHER ORDERED, that the defendant Regents of the University of California be and hereby is enjoined from proceeding with the deliberate release experiment approved by NIH on June 1, 1983 at 48 Fed. Reg. 24549 (1983) until such time as the Court enters final judgment on the merits of counts one and two of plaintiffs' amended complaint.